

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-26-00153-CR
No. 02-26-00154-CR

———————————————

EX PARTE SHERMYN MALANI

AND

EX PARTE IQBAL MALANI

On Appeal from Criminal District Court No. 4
Tarrant County, Texas
Trial Court Nos. 1913970, 1913874

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

Appellants Shermyn and Iqbal Malani face aggregate bonds of $25 and $30 million, respectively, in cause numbers 02-26-00153-CR and 02-26-00154-CR, for a combined bond exposure of $55 million. The State has not cited, nor has this court found, any Texas case law upholding bonds anywhere near these amounts. Yet, the habeas court denied the Malanis' pretrial applications for bond reductions.[1]

According to the State, the habeas court's ruling was within the zone of reasonable disagreement because the Malanis' alleged crimes—their Georgia jewelry store's alleged purchase of stolen gold bars in a nationwide fraud scheme—suggest that they have access to large, untraceable amounts of cash.

But bonds of $25 and $30 million are beyond the pale. And while the habeas court was not required to believe the Malanis' evidence of their limited financial resources, it was not permitted to speculate without evidentiary support, either.

Moreover, the State presented little evidence actually connecting the Malanis' jewelry store to the fraud scheme. Instead, the evidence shows that the Malanis have deep ties to their Georgia community, they have no known criminal history, and after learning of the warrants, they came to Texas to turn themselves in.

---

[1]When the habeas court denied relief, it noted that it had been the court that "approve[d] the arrest warrants" and "set [the] bonds" originally.

In short, the bonds are excessive—particularly on the record before us.[2] We will reverse.

## I. Governing Law and Standard of Review

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *Chavez v. State*, 671 S.W.3d 775, 784 (Tex. App.—Fort Worth 2023, no pet.) (quoting *United States v. Salerno*, 481 U.S. 739, 755, 107 S. Ct. 2095, 2105 (1987)). The federal and state constitutions reflect this norm by, among other things, prohibiting the imposition of "[e]xcessive" bond.[3] U.S. Const. amend. VIII; Tex. Const. art. I, § 13; *see* Tex. Const. art. I, § 11; *Chavez*, 671 S.W.3d at 784–85; *see also* Tex. Code Crim. Proc. art. 17.15(a)(2) (reiterating that "[t]he power to require b[ond] is not to be used to make b[ond] an instrument of oppression"). Bond is excessive if it is set "in an amount greater than is reasonably necessary to satisfy the government's legitimate interests." *Chavez*, 671 S.W.3d at 785; *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd).

The bond determination is governed by the provisions of the Constitution, the guidelines set forth in the Code of Criminal Procedure, and the factors identified by the Court of Criminal Appeals. Tex. Code Crim. Proc. art. 17.15(a); *Chavez*, 671

---

[2]Both appeals arise from the same record—the same habeas hearing, witness testimony, warrant materials, and written findings of fact and conclusions of law.

[3]Texas law "uses 'bail' and 'bond' interchangeably." *Ex parte Gomez*, 624 S.W.3d 573, 577 (Tex. Crim. App. 2021) (holding that "'bail' and 'bond' as used in Chapter 17 [of the Code of Criminal Procedure] are interchangeable terms").

S.W.3d at 785. Taken together, these governing principles require the habeas court—

and this court—to consider

- "[t]he nature of the offense," including whether it "involv[ed] violence," Tex. Code Crim. Proc. art. 17.15(a)(3);

- the defendant's community ties, length of residency, and "citizenship status," *id.* art. 17.15(a)(7); *Gomez*, 624 S.W.3d at 576;

- the defendant's "criminal history record information" including "any instances in which the defendant failed to appear in court," Tex. Code Crim. Proc. art. 17.15(a)(6); *Gomez*, 624 S.W.3d at 576;

- the amount or release conditions that are "sufficient to give reasonable assurance that the undertaking will be complied with" and that the "future safety of [the] victim" and community will be protected, Tex. Code Crim. Proc. art. 17.15(a)(1), (5); *see id.* art. 17.028(b); and

- the defendant's "ability to make b[ond]," *id.* art. 17.15(a)(4).

We review a habeas court's bond determination for an abuse of discretion and

will not disturb it as long as it is within the zone of reasonable disagreement. *Gomez*,

624 S.W.3d at 576; *Chavez*, 671 S.W.3d at 785; *Beard*, 92 S.W.3d at 568, 573. We view

the record in the light most favorable to the habeas court's ruling. *Gomez*, 624 S.W.3d

at 576.

## II. Analysis

The Malanis' $25- and $30-million bonds are not within the zone of reasonable

disagreement. Not one bond consideration supports an amount of this magnitude—

(1) the nature of their alleged offenses is vague and the evidence weak; (2) they have

deep ties to their Georgia community; (3) they have no known criminal history or

4

pattern of absconding; (4) the habeas court's restrictive bond conditions are more than sufficient to protect the government's interests; and (5) the Malanis' liquid assets have largely been frozen or seized.

## A. The Malanis' Offenses

The Malanis' $25- and $30-million bonds stem from their arrests for two felonies each:[4] engaging in organized criminal activity and financial abuse of the elderly of $150,000 or more. *See* Tex. Penal Code §§ 32.55(c), (d)(6), 71.02(a)(8), (b)(3). The State presented very little evidence of these offenses at the habeas hearing, though; it relied solely on the affidavit that accompanied the Malanis' arrest warrants.[5] *See Chavez*, 671 S.W.3d at 779 & n.2 (noting that because the State relied on two probable cause affidavits to prove the defendant's alleged offense, "we are similarly limited").

That affidavit accumulates reports from numerous law-enforcement entities and details a nationwide network of individuals who have defrauded people of their wealth. Generally, the fraud scheme involved a victim's being contacted by someone who purported to work for a government agency and who would convince the victim

---

[4]After the habeas court orally denied relief, but before the habeas court signed the judgment and issued findings of fact and conclusions of law, the Malanis were each indicted on five felony counts, including two counts of engaging in organized criminal activity and one count of financial abuse of the elderly of $150,000 or more. The State represents that no bonds have been set on the new offenses.

[5]The same affidavit accompanies both of the Malanis' arrest warrants.

that he needed to pay a large fine by either (1) providing the amount in cash or (2) converting his wealth into gold bars.[6] A courier would retrieve the cash or gold bars,[7] and in the latter case, the courier would sell the gold bars to a jewelry store for less than market value. The jewelry store would then melt the gold bars to make inventory—thereby preventing the stolen gold from being traced back to the victim.

But while the State's affidavit is detailed and lengthy—spanning more than 80 pages—there are only a handful of references to the Malanis' Georgia jewelry store.

In that handful of references, the affidavit states that a "confidential source" identified the three locations of Malani Jewelers[8]—including the Georgia store owned and managed by Iqbal and Shermyn[9]—as frequent purchasers of the fraud scheme's stolen gold bars. The source claimed that he had worked for the Texas location of

---

[6]In the habeas court's findings of fact and conclusions of law, it found that the victims' alleged losses from the nationwide fraud scheme exceeded $250 million. It is unclear how the habeas court calculated this figure; it does not appear in the State's affidavit. And, tellingly, the State does not cite the $250-million figure on appeal.

[7]Several couriers retrieved stolen goods from more than one victim, linking the cases together. And, once arrested and interviewed, at least one individual "admitted to being a member of a . . . [specific named] network for moving cash, gold, and silver in an untraceable fashion."

[8]The Malanis own an interest in the other two locations of Malani Jewelers, but they do not manage those stores' day-to-day operations.

[9]The affidavit alleges that Iqbal owns the jewelry store, and it hinges Shermyn's involvement on her marriage to Iqbal and her ownership of a related information-technology company. However, at the habeas hearing, the testimony indicated that both Iqbal and Shermyn are involved in the jewelry store's day-to-day operations.

Malani Jewelers—the location later shown to be managed by Iqbal's sibling—and he had witnessed the store "purchase gold that could not be documented at . . . 30–40% off the going rate of gold on the market." The source explained that the Texas store would either melt the gold bars or, occasionally, send them to the Malani Jewelers store in Georgia for melting. The source reported that Georgia was "the main [melting] operation and . . . the gold was intermingled there."[10]

The State's affidavit purports to corroborate the confidential source's information by (1) noting that one of the courier's cell phones "showed him close to [the] Malani Jewelers" store in Dallas at one point; (2) quoting negative customer reviews that claim Malani Jewelers sold them counterfeit items; and (3) noting that Shermyn owns an IT company associated with the Georgia store and that, "[i]n other areas of this case, [i]nvestigators have found that IT companies are used for [visa] fraud and money laundering."

This was the sum total of the evidence of the Malanis' alleged crimes.

Granted, these allegations are serious. The Malanis were each arrested for two first-degree felonies, and each offense carries the potential of life in prison. *See* Tex. Penal Code §§ 12.32, 32.55(d)(6), 71.02(a)(8), (b)(3); *see also Gomez,* 624 S.W.3d at 576 (noting that, in considering the nature and circumstances of the offense, the consideration "implicate[s] the range of punishment").

---

[10]The confidential source also alleged related misdeeds by the Malanis, such as "cheating on sales tax collections" and hiring illegal immigrants.

Moreover, Texas appellate courts have upheld relatively high bond amounts when the crimes at issue involve large quantities of off-the-books cash[11] or are connected to a broader criminal network that suggests the involvement of "monied backers." *Ex parte Reyes*, 4 S.W.3d 353, 354–56 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (upholding $3-million bond when the State presented evidence that the "unprecedented[] large amount of cocaine" the defendant was charged with possessing had a street value of $56 to $87 million, and noting that "cases involving large quantities of drugs usually require high bonds because the large amount of cash required to effect such transactions usually suggests involvement of monied backers"); *Maldonado v. State*, 999 S.W.2d 91, 95–96 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (upholding $2.5-million bond, noting that it "[wa]s significantly less than the lowest value of the drugs allegedly possessed by appellant," and recognizing that "the large amount of cash required to effect these kinds of transactions suggests involvement of monied backers"); *see Ex parte Goodson*, No. 01-15-00288-CR, 2015 WL 1868771, at *5–6 (Tex. App.—Houston [1st Dist.] Apr. 21, 2015, no pet.) (per curiam) (mem. op., not designated for publication) (upholding $750,000 bond that

---

[11]The habeas court's findings of fact and conclusions of law emphasize that the fraud network's victims were robbed of "*untraceable assets*." The State adopts this argument on appeal, repeatedly emphasizing that "the victims have lost millions of dollars in *untraceable* assets." But the State's affidavit indicates that the losses are untraceable as to the victims—not that the Malanis, who allegedly melted the gold bars to make inventory, sold their inventory in an untraceable fashion or held their income in an untraceable account.

was "approximately 27% of the $2,790,000 in checks alleged to have been stolen"); *Ex parte Waddell*, No. 14-02-01237-CR, 2003 WL 21403545, at \*1–5 (Tex. App.— Houston [14th Dist.] June 19, 2003, no pet.) (per curiam) (mem. op., not designated for publication) (upholding $1.6-million bond for engaging in organized criminal activity when the defendant had allegedly used stolen credit to buy more than $780,000 in property and had attempted to use counterfeit money). But even then, such relatively high bond amounts have been a fraction of the $25- and $30-million bonds set here. *See Maldonado*, 999 S.W.2d at 97 (upholding $2.5-million bond in drug case but calling bond "considerably high").

And the State's affidavit contains little evidence that the Malanis were knowing participants in the larger fraud scheme anyway. Although the State, on appeal, characterizes the Malanis' Georgia store as being "at the epicenter of the gold-bar scam," there is no evidence in the record to show that the Malanis contacted any of the victims or directed any of the couriers. Indeed, there is little evidence that the Malanis were even aware of the fraudulent activities that preceded the gold bars' arrival at their Georgia store. Rather, the State's affidavit alleges that, in those instances when the fraud scheme's participants stole gold bars, the Malanis' Georgia jewelry store purchased some of those gold bars after the fact, and they did so in off-the-books, below-market-value transactions that—when coupled with the Malanis' subsequent melting of the bars—suggests the Malanis knew the gold bars were questionable. Such limited, non-violent involvement is a far cry from the "epicenter"

9

of the scheme. *Cf.* Tex. Code Crim. Proc. art. 17.15(a)(3) (requiring court to consider the nature of the offense, including whether it did—or did not—involve violence).

Of course, the State can—and presumably will—produce significantly more evidence at trial. But the record that is before us—and that was before the habeas court—is sparse.

This bond consideration does not weigh in favor of a particularly high bond, much less a $25- or $30-million one.

## B.     The Malanis' Citizenship Status and Community Ties

The Malanis' citizenship status and community ties are bond considerations as well. *See id.* art. 17.15(a)(7); *Beard*, 92 S.W.3d at 568 ("In applying [A]rticle 17.15, consideration may be given to such evidentiary matters as the defendant's work record[ and] ties to the community . . . .").

The record reflects that the Malanis are American citizens who have lived in Georgia for more than 30 years. Although they are also Canadian citizens, and although Shermyn's mother and siblings still live in Canada, the Malanis have already surrendered their passports to their counsel, and their counsel informed the habeas court that he was ready and willing to deposit them into the court's registry.

Additionally, the evidence shows that the Malanis raised their children in the Atlanta area where they reside, the majority of their family lives there, and they have deep ties to that community. Their daughter-in-law—a nurse practitioner in the Atlanta area—testified that the Malanis are "heavily involved" and "extremely well

10

known in the community." She described how Iqbal holds a "prestigious" title as a "spiritual leader" in their religious community while Shermyn teaches children at their church. She explained that Iqbal started Malani Jewelers with his father approximately 30 years ago, and she estimated that the Malanis had donated "over ten million" to charities in the years since the store opened.

Although Iqbal's sibling owns a Malani Jewelers store in North Texas, Iqbal does not participate in the store's day-to-day management; his ties are in Georgia. But at the time of the habeas hearing, Iqbal's father connected him to the North Texas area.

The Malanis' daughter-in-law testified that Iqbal's father is suffering from "pretty advanced dementia" and had lived in the Atlanta area until a few months before the Malanis' arrest, when an issue with the father's daily care provider led Iqbal's family in Texas to temporarily take in the father. Iqbal hoped to identify a new daily care provider in the Atlanta area and to move his father back there, as that is where his father's physicians are located and where the majority of the Malani family lives. Iqbal's connection to North Texas is thus temporary—but strong.

Moreover, while the State emphasizes the Malanis' minimal ties to Texas, the lack of such ties cuts both ways, as it highlights the sparse evidence linking the Malanis to the alleged Texas-based crimes in the first place.

More importantly, the uncontroverted evidence shows that the Malanis are deeply connected to their Atlanta-area community and that, upon learning of the

11

Texas warrants for their arrest, they gave their passports to their counsel and turned themselves in to the Texas authorities.[12] "Logic suggests that[,] if [they] were inclined to flee, [they] would have done so then." *Beard*, 92 S.W.3d at 573 (reversing $8-million bond in case involving capital murder and noting that, despite the defendant's "apparent wealth," the "bulk" of such wealth came after her accomplice's arrest, and the defendant did not flee).

This consideration does not support a high bond amount.

## C. The Malanis' Criminal History

The Malanis' nonexistent criminal history—another bond consideration—also weighs against a high bond amount. *See* Tex. Code Crim. Proc. art. 17.15(a)(6) (requiring court to consider "[t]he criminal history record information for the defendant . . . , including any acts of family violence, other pending criminal charges, and any instances in which the defendant failed to appear in court following release").

There was no evidence that the Malanis had any criminal history whatsoever. At the habeas hearing, the Malanis' Georgia attorney testified that his firm had performed civil work for the Malanis for nearly a decade and that he was unaware of them having ever been investigated for, charged with, or convicted of a crime. The attorney also confirmed that, as the Malanis' daughter-in-law testified, "the moment

---

[12]In its findings of fact and conclusions of law, the habeas court found that the Malanis were "arrested and extradited to Texas to face the pending first[-]degree felony charges." There is no evidence of extradition.

[the Malanis] knew about [the charges,] they made immediate decisions to get over to Texas and comply with what was needed to be done"—even though they knew their aggregate bonds had been set at $25 and $30 million.

The absence of any evidence of a criminal history or pattern of absconding weighs against a high bond amount.

## D. The Government's Interests

The next bond consideration—the government's interests—does not support a high bond amount either. *See id.* art. 17.15(a)(1), (5) (requiring court to determine the amount and conditions "sufficient to give reasonable assurance that the undertaking will be complied with" and to consider "[t]he future safety of a victim of the alleged offense, law enforcement, and the community"). The habeas court's bond conditions are more than adequate to protect the community's safety and to ensure the Malanis' appearance at trial, without the need for an exorbitant bond. *See id.* art. 17.028(b) (noting that, in setting bond, the court should "impose the least restrictive conditions . . . and the [bond] necessary to reasonably ensure the defendant's appearance in court as required and the safety of the community . . . and the victim"); *Ex parte Durst*, 148 S.W.3d 496, 501 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (op. on reh'g) (reversing $3-billion excessive bond, reviewing bond conditions, and noting that "some cases have considered conditions as a means of assuring a defendant's appearance or of protecting the victim and society").

As a preliminary matter, again, the State's affidavit does not show that the Malanis were aware of the nationwide fraud scheme that produced the stolen gold bars they purchased. But even if they had been aware, the Malanis' bond conditions ensure that they cannot participate in the scheme—or do much of anything—if they are released on bond. The conditions require the Malanis to, among other things,

- submit to 24-hour GPS monitoring;

- "remain confined in their chosen place of residence 24 hours a day, seven days a week, except for meetings with their counsel of record and their bonding agents";

- "notify the court about their intended place of residence" and "not move without advance permission of the court";

- "not leave the United States . . . without advance written permission of the court" and "surrender their passports to the registry of the court within 24 hours of release";

- "install internet-monitoring software on every internet-capable device to which they have access";

- refrain from using an internet-capable device unless it has such software; and

- "consent to unannounced visits" at their residence and "to a search of their person, vehicle, and/or place of residence" on demand "to verify compliance with the conditions of bond."[13]

---

[13]The Malanis do not challenge these bond conditions, so we need not consider whether they reflect "the least restrictive conditions . . . necessary to reasonably ensure the defendant[s'] appearance in court as required and the safety of the community . . . and the victim." Tex. Code Crim. Proc. art. 17.028(b).

14

The Malanis' Georgia attorney, their daughter-in-law, and Shermyn's brother-in-law confirmed that they would help enforce the Malanis' bond conditions and ensure that the Malanis attended all court settings.

And the evidence shows that, to date, the Malanis have complied with the conditions imposed upon them in the case. Again, the Malanis voluntarily surrendered on the Texas warrants for their arrest. *See* Tex. Code Crim. Proc. art. 17.15(a)(1) (requiring court to consider whether "[b]ail and any conditions of b[ond are] . . . sufficient to give reasonable assurance that the undertaking will be complied with").

The habeas court's bond conditions should be more than adequate both to prevent the Malanis from participating in the nationwide fraud scheme while out on bond and to ensure that the Malanis appear at trial. This bond consideration does not support a high bond amount.

### E.    The Malanis' Ability to Pay

The final bond consideration—the Malanis' ability to pay—does not support a high bond amount either.

The Malanis presented testimony from a bondsman regarding their efforts to post bond, and their family discussed their finances and assets in detail.[14] *Cf. Ex parte Jackson*, Nos. 14-10-00979-CR, 14-10-00980-CR, 14-10-00981-CR, 14-10-00982-CR,

---

[14]The habeas court expressly found the bondsman to be a credible witness.

14-10-00983-CR, 2011 WL 166933, at *4 (Tex. App.—Houston [14th Dist.] Jan. 13, 2011, no pet.) (per curiam) (mem. op., not designated for publication) (affirming aggregate bond of $810,000 for engaging in organized criminal activity and several other offenses and noting that the defendant's wife's "unsupported, vague[,] and conclusory testimony" regarding her finances and attempts to make the bonds did not "justify a reduction").

The bondsman testified that he had "spoken to [the Malani family] very frequently" in the weeks preceding the habeas hearing and that the Malanis "ha[d] looked [at the bonds] from every angle" to find a way to post them. He stated that many local bonding companies will not write multi-million-dollar bonds at all, and for those companies that will, he was not aware of any that would post a bond over $1 million without requiring up-front cash collateral equal to the full amount of the bond. *See Durst*, 148 S.W.3d at 499 (noting that three $1-billion bonds "were so excessive, no one could meet them—not [the wealthy defendant], and not any of the bail bond companies" and interpreting this unaffordability as an indication that the bond was "being used as an instrument of oppression"). *But cf. Reyes*, 4 S.W.3d at 355 (noting that the "inability of a bail bondsman to post bond is not determinative of the amount of b[ond] a trial court may set in a particular case").

The Malanis' family members, in turn, explained that the Malanis do not have the ability to provide up-front cash collateral of $25 or $30 million. Their daughter-in-law and Shermyn's brother-in-law testified that the Malanis own two Lexus

16

vehicles—one paid off, the other not; a five-bedroom house outside Atlanta that the brother-in-law believed had a mortgage; a condominium in Georgia where Iqbal's father lived until recently; and a condominium in Canada where Shermyn's mother lives. The Malanis have no boats, planes, or other significant assets; Shermyn's brother-in-law stated that all of their assets are in Malani Jewelers. And those assets have largely been seized or frozen.

Shermyn's brother-in-law testified that the police raided the Malanis' Georgia store and seized approximately $30 million in inventory.[15] He confirmed that the Malanis' business and personal bank accounts—which hold approximately $700,000 and $40,000 respectively—have been frozen as well. He described the Malanis as being in "dire straits" financially, and their daughter-in-law testified that she had been handling their bills out of her "own savings and [her] own accounts."

But the State seized on Shermyn's brother-in-law's admission that it was "possible" the Malanis had bank accounts of which he was unaware. And when the habeas court denied relief, it stated that it "th[ought] these Defendants ha[d] a lot more resources than ha[d] been portrayed in the court today."[16]

---

[15]Police similarly raided the Malani Jewelers location in Dallas and seized approximately $20 million in inventory.

[16]In the habeas court's findings of fact and conclusions of law, it states that the Malanis' family's testimony "did not persuade the [court] . . . that [they] do not still have access to vast *additional* resources they could use to flee the court's jurisdiction."

The habeas court is free to disbelieve the Malanis' testimony regarding their finances, but it cannot speculate without evidentiary support. *See Chavez*, 671 S.W.3d at 789 (reversing $1-million murder bond as excessive and noting in analysis that, "[w]hile the trial court was not required to believe [the defendant's mother's] testimony, there was no evidence to contradict her either" (internal citations omitted)). And apart from the fraud network described in the State's affidavit—an affidavit that ties the Malanis to the network by a spindly thread—there is no evidence that the Malanis have access to millions "more . . . than [was] portrayed in the [habeas] court."

Regardless, even if the Malanis had an unknown amount of additional wealth, it would not justify the $25- and $30-million bonds here. "Just as a defendant's inability to afford b[ond] does not, in itself, demonstrate that b[ond] is excessive, a defendant's ability to afford [a high bond] in the amount set does not in itself justify b[ond] in that amount." *Beard*, 92 S.W.3d at 573.

Our sister courts have noted as much when faced with similar eye-popping bond amounts. In *Beard*, our sister court reversed an $8-million bond that had been set for several felonies, including capital murder. *Id.* at 567. There, as here, the defendant's wealth was disputed; she insisted that she had spent her money on legal counsel, but the State argued that she had access to more than $3 million in cash based on prior inheritances and property sales. *Id.* at 569–70. The State thus argued that the defendant was "in a unique position due to her wealth." *Id.* at 572. But our

18

sister court highlighted that the $8 million bond was "more than eight times higher than the highest b[ond] previously determined to be reasonable in a reported Texas capital murder case." *Id.* at 571–74 (collecting cases involving high bonds and noting that, in one, a $1-million bond for "brutal, gang-related murder" had been reduced to $600,000; in another, a $2-million bond for capital murder had been reduced to $100,000; in another, a $1-million bond for kidnapping and murder had been reduced to $75,000; and in another, a $1-million bond for murder had been reduced to $300,000). Even assuming the defendant was wealthy, her wealth did not itself justify a high bond—the bond was "excessive if set in an amount greater than is reasonably necessary to satisfy the government's legitimate interests." *Id.* at 573–74 (noting that "a dramatic departure from prior practice is at least suggestive of an abuse of discretion").

Similarly, in *Durst*, another sister court reduced a $3-billion aggregate bond to $450,000. *Durst*, 148 S.W.3d at 497–501. Once again, the high bond amount was largely attributable to the defendant's "apparently great, but undetermined, wealth," which included $2 to $4 million in liquid assets plus ambiguous trust assets, real estate holdings, annuity income, and offshore accounts. *Id.* at 497, 499–500. On top of that, the defendant had used his wealth to abscond when his bond was set at $300,000 in a prior case. *Id.* at 498–99. Nonetheless, our sister court of appeals rejected the $3-billion bond as "outrageously excessive," lowering it to $450,000. *Id.* at 497–501.

19

This case, too, involves an "outrageously excessive" bond based on the Malanis' allegedly off-the-books wealth—wealth that, even if there were evidence of its existence, would "not in itself justify b[ond] in that amount." *Id.* at 497; *Beard*, 92 S.W.3d at 573. Like the other bond considerations, the Malanis' ability to pay does not support the $25- and $30-million bonds. *See* Tex. Code Crim. Proc. art. 17.15(a)(4) (requiring court to consider "[t]he ability to make b[ond]").

## III. Conclusion

Taking these bond considerations together, the habeas record reveals that (1) the Malanis face serious felony charges, but there is little evidence of their commission of those alleged offenses or their connection to the larger fraud scheme; (2) although they are Canadian citizens, they are American citizens as well, they have deep family and community ties in the United States, and they have surrendered their passports; (3) they have no known criminal history or pattern of absconding; (4) the habeas court's bond conditions are more than adequate to protect the community and ensure the Malanis' presence at trial; and (5) the Malanis' liquid assets have largely been seized or frozen. To this we add another important factor: the Malanis are presumed innocent. *See Beard*, 92 S.W.3d at 573 ("In setting b[ond], a balance must be struck between the defendant's presumption of innocence and the State's interest in assuring the defendant's appearance at trial."). So, even viewed in the light most favorable to the habeas court's ruling, reasonable minds can differ as to the precise

bond amount necessary, but the current $25- and $30-million bonds are far beyond the zone of reasonable disagreement.[17]

We reverse the habeas court's order denying relief and remand the causes to that court to set reasonable, non-excessive bonds. *See* Tex. R. App. P. 43.2(d).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 30, 2026

---

[17]Even the State, in its brief, "recognizes that the aggregate amount of [each of the Malanis'] b[onds] is significantly more than traditional criminal cases." And, seeing the writing on the wall, it urges this court—if we hold the Malanis' bonds excessive—to either remand the bond determination or to set the bonds "to $500,000 per count," i.e., $1 million per defendant. It is revealing that the State's suggested reduction—which the State presumably considers on the higher end of the range of reasonable bond amounts—is less than 5% of the current bond set for each Malani.

Regardless, given the fact-intensive nature of the bond inquiry, we remand the determination to the habeas court.